**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**
_____

JACQUELINE FRENCH,

        Plaintiff,

        v.                                  12-CV-0756-A
                                           **FINDINGS OF FACT AND**
COUNTY OF ERIE,                        **CONCLUSIONS OF LAW**

        Defendant.
_____

        This case is before the Court following a bench trial on Plaintiff Jacqueline French's Title VII retaliation claim against the Defendant, County of Erie. For the reasons stated below, the Court finds that French has not proven by a preponderance of the evidence that she was terminated in retaliation for filing a complaint with the Equal Employment Opportunity Commission (EEOC). Judgment shall therefore be entered for the County of Erie on all claims.

### BACKGROUND

        On January 31, 2018, the Court adopted Magistrate Judge Leslie G. Foschio's recommendation to grant the Defendants' motion for summary judgment on each of French's claims, except for her retaliatory-discharge claim. *See* Docket No. 42. After the Court adopted Judge Foschio's recommendation, the only remaining defendant in this case is the County of Erie, and French's only remaining claim is for retaliatory discharge, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* The parties then stipulated that French was not entitled to a jury trial. Docket No. 45. The Court therefore conducted a bench trial on July 16 and July 18, 2018.

1

At trial, French testified and offered testimony from one other witness, Geraldine McClendon. The Defendant offered testimony from four witnesses: Paul Palumbo, Harold (Joel) Little, Elizabeth Bochiechio, and Ralph Mohr. In addition, the parties agreed to admit into evidence the deposition of defense witness Grant Loomis. Finally, the parties offered a number of exhibits into evidence.[1] The Court then received the parties' proposed findings of fact and conclusions of law and heard closing arguments.

## FINDINGS OF FACT[2]

The findings of fact that follow are based only on the testimony and exhibits introduced at the bench trial held on July 16 and 18, 2018. All findings are made by a preponderance of the evidence. The Court found each witness to be credible, except as noted below.

### French's tenure at the Erie County Board of Elections

The Erie County Board of Elections is responsible for, among other things, administering elections and qualifying candidates for elected office in Erie County, New York. N.Y. Election Law § 3-200; Tr. 183:2-7. The Board is made up of two Commissioners: one Republican Commissioner—Ralph Mohr—and one Democratic

---

[1] The following exhibits were entered into evidence: Plaintiff's Exhibits 1, 3, 4, 5, 6, 9, and 15; and Defendant's Exhibits 1, 3, 5, 8, 9, 11, 12, 35, 36, and 37.s

[2] As discussed below, the Court concludes that French's termination did not violate Title VII because, in deciding to fire French, Mohr reasonably relied on his employees' reports to conclude that French had stolen County-owned property. The truth of those allegations is immaterial to the Court's Title VII analysis. Thus, the Court need not, and does not, make a finding concerning whether French did, in fact, steal County-owned property. Likewise, because the Court concludes that Erie County is not liable to French, the Court does not make factual findings concerning the County's claim that French's desk drawer contained unprocessed absentee ballot applications. Those facts would only be relevant to the amount, if any, of French's damages. For the same reason, the Court need not address French's request for a missing-witness inference concerning Samara Wilson. As French acknowledges, Ms. Wilson's testimony would only have been relevant to the unprocessed-ballots issue. Any testimony Ms. Wilson would have given on that issue would be irrelevant to the Court's conclusions.

Commissioner (at the time of the events at issue in this case, Dennis Ward). Mohr and Ward jointly decided to hire and fire employees, but in practice, Mohr deferred to Ward regarding Democratic employees and Ward deferred to Mohr regarding Republican employees. Tr. 183:21 – 184:18.

French, who is a Republican, was hired by Mohr in October 2006. She began as a part-time employee and was promoted to Junior Election Clerk (a full-time position) several months later. Tr. 186:21 – 187:11. For most of the time she spent as a full-time employee at the Board of Elections, French worked in the Absentee Department, where her duties included processing absentee ballots and requests for absentee ballots. Tr. 26:1-23.

In early 2011, French filed a complaint with Erie County's Equal Employment Opportunity Office regarding a Board of Elections employee. French's complaint was sustained several months later. The next month, she was promoted from Junior Election Clerk to Senior Election Clerk and received a raise of approximately $5,000. Mohr made the decision to promote French, but his decision was not the result of French's internal complaint. Rather, Mohr promoted French and one other employee because they had worked at the Board of Elections for several years without promotion and because Mohr "had sufficient money in the budget that year to provide promotions." Tr. 187:20 - 188:18.

On January 3, 2012, French was reassigned to the Registration Department. There, French's duties included processing voter registration forms and preparing for upcoming elections. Tr. 22:1-18. French's productivity in the Registration Department "was lower than most employees," Tr. 109:12-13, but she did not believe that her supervisors had issues with her work, at least during her first two months in Registration.

3

Tr. 22:19 – 23:7. Indeed, French and her immediate supervisor, Joel Little, had a "very good relationship." Tr. 60:3-4.

French filed a complaint with the EEOC on or about January 18, 2012—that is, about two weeks after she was transferred to the Registration Department. *See* Pl.'s Ex. 1.[3] The EEOC sent French a response several days later, and French provided additional information to support her claim. French did not discuss her EEOC complaint with anyone at the Board of Elections. Tr. 13:21 – 14:3; 16:14 – 16:25.

The EEOC notified Mohr of French's complaint in late January, but the EEOC did not ask Mohr to provide any response until several months later. Tr. 196:16 -197:2. Mohr credibly testified—and the Court finds—that, consistent with his usual practice concerning employee complaints, he did not share the existence or contents of the complaint with any of his employees and, instead, handled the complaint himself, in consultation with the County Attorney. Tr. 197:5-10; 198:9-17; 203:7-17; 201:19-22.

French testified that, after she filed her EEOC complaint, the Republican Office Manager, Beth Bochiechio, began "monitoring" her work. Tr. 19:20. Specifically, French believed that Bochiechio made French a "target every morning," Tr. 60:10-11, by requiring French—and no one else—"to bring [her] work" to Bochiechio for review. Tr. 19:17-22.[4]

Bochiechio credibly testified, however—and the Court finds—that Bochiechio's "monitoring" was, in fact, part of Bochiechio's effort to train French on tasks in the Registration Department. Bochiechio gave French this training because, although French

---

[3] French's EEOC complaint and other related documents were admitted into evidence only for the purpose of establishing that French filed a complaint with the EEOC. Thus, the Court has not considered the documents' contents.

[4] French offered no evidence to support her claim that other employees did not receive similar "monitoring" after transferring to a new department.

4

was "very familiar with the system," she "needed a quick refresher" on performing jobs unique to the Registration Department.[5] Tr. 128:22-25. Indeed, French acknowledged that she had not previously worked in the Registration Department. Tr. 22:13; Tr. 60:24-25 (French acknowledging that "[s]ome of" the tasks in the Registration Department were new to her). To train French, Bochiechio followed the "general procedure" for training employees at the Board of Elections: after an initial period of one-on-one training, the trainer reviews the trainee's work "for a couple weeks" to "catch their mistakes." Tr. 129:6-13. As part of this process, Bochiechio reviewed "batches" of French's work every morning, but she never disciplined French for mistakes. Tr. 129:18-23. The Court credits Bochiechio's explanation for what French perceived as "target[ing]" and finds nothing improper or suspect about Bochiechio's conduct.

Despite her training, French had difficulty completing her assigned tasks in the Registration Department. Bochiechio ran monthly or bi-monthly reports of each employee's work to review the number of "transactions" the employee had performed the previous month. Tr. 130:7-19. (A Board of Elections employee performs a "transaction" each time he or she makes "a change to a voter's registration, whether it's a brand new voter or . . . updating an existing voter," e.g., updating a registered voter's address. Tr. 131:5-9.) In March, Bochiechio ran French's transaction report for February, which showed that French "had zero transactions done for the whole month"—a fact that "set an alarm off" for Bochiechio. Tr. 130:20-131:2. Bochiechio asked French why she had

---

[5] "[G]eneral[ly]," a new employee at the Board of Elections would be trained by a senior employee of the same political party. Tr. 128:12-15. However, Bochiechio, the Republican Office Manager, decided to train French herself because most employees had worked in the Registration Department for less time than French had worked at the Board of Elections. Bochiechio thought "it would have been degrading" for French to be trained by an employee with less seniority and decided, instead, to train French herself. Tr. 128:16-20.

5

performed zero transactions for February; French responded that her computer was very slow, which Bochiechio verified. French also told Bochiechio that she thought that "that's the way [her] computer was supposed to be." Tr. 132:6-17. Bochiechio was "a little frustrated" that French had allowed an entire month to go by without addressing an IT issue that had resulted in her not doing a single transaction—in other words, "the part of the job that she was supposed to do"—for an entire month. Tr. 132:18-22; Tr. 136:11-12.

**The events leading up to French's termination**

In early March 2012, Maintenance Supervisor Paul Palumbo sent Republican Commissioner Ralph Mohr a letter stating that Palumbo had received reports from a cleaner that "paper products + other cleaning suppl[ies] have been taken from [the cleaner's] cart while she was cleaning restrooms on the 3rd floor" of the building in which the Board of Elections is located. Pl.'s Ex. 6.[6] French's desk was located on the third floor. Tr. 142:8-9. Mohr spoke with the Republican supervisors—Bochiechio, Deputy

---

[6] Palumbo reported missing cleaning supplies to Mohr in a letter dated March 9, 2012. French testified that she was in Detroit on March 9, but nothing in the trial record suggests that Palumbo wrote his letter on the same day that the cleaner noticed that supplies were missing. French also testified that Palumbo told her in September 2012 that he had never seen the letter and that the letter did not contain his handwriting. Tr. 30:1-4. These statements, however, are inadmissible hearsay, which the Court does not consider. Instead, the Court credits Palumbo's testimony that the note contained his handwriting and his signature. The Court found Palumbo to be a credible witness, and it therefore credits his testimony regarding the letter's origin.

Geraldine McLendon—whom Palumbo's letter identified as the source of his report of missing cleaning supplies—testified that she never reported missing toilet paper. Tr. 74:9-75:7. McLendon's testimony was, at times, impassioned, and the Court generally found her to be credible. The Court, however, has discounted McLendon's testimony because it was not clear that she had a sufficient independent memory of the events at issue in this case. For instance, McLendon acknowledged at trial that a letter she had signed—which stated that McLendon had "never seen Jacqueline French steal anything off my cart during my shift or at any other time," Pl. Ex. 12—was not written by McLendon, but was, instead, written by someone else for McLendon to sign. Tr. 76:19-22; 79:24 – 80:10. *See also* Tr. 79:17-23 (McLendon's testimony that she "just d[id]n't remember" how she learned that she had been identified as the source of information contained in Palumbo's note). Similarly, McLendon repeatedly testified—even after being corrected—that she had worked at the Board of *Education*, rather than the Board of Elections. *E.g.*, Tr. 69:18-19; 77:12-16. In any event, the source of the information in Palumbo's note is irrelevant to the Court's Title VII analysis. As discussed below, *infra* at 15-16, French offered no evidence suggesting that Mohr should not have relied on Palumbo's note in deciding to fire French.

Commissioner Grant Loomis, and the supervisor of the Absentee Department, Mario Alaimo—to learn whether they had knowledge of missing cleaning supplies. Tr. 189:6-9. Alaimo told Mohr that he had "no direct knowledge of anything being taken, but that two employees had spoken to him, at one point, about . . . French having cleaning supplies at her desk." Tr. 189:11-15. In addition to these reports, another Board of Elections employee, Summara Wilson, told Mohr "that there was talk around the office that cleaning supplies had been taken." Tr. 190:23 – 191:4.[7]

On March 16, 2012, French's immediate supervisor, Joel Little, was alerted by another employee that French had "a bag of toilet paper on her desk." Tr. 98:24-25. Little left his office, walked by French's desk, and saw a "white," Tr. 105:3, "clear, milky" bag from a local grocery store, through which he could "clearly see" two "commercial-grade" rolls of toilet paper, one of which appeared to be used "due to the fact that it was smaller." Tr. 99:1-2; 101:3-10.[8] Little was "literally . . . right next to" French's desk when he saw the toilet paper. Tr. 101:20-21.[9] The bag was closed, but because it was clear, Little was able to see the bag's contents. Tr. 104:21-105:3. Little reported his observation to Bochiechio. At the time he observed the toilet paper, Little had no knowledge of French's EEOC complaint. Tr. 100:8-11.

---

[7] Each of these statements is, of course, hearsay. However, the Court does not consider any of these statements for their truth—that is, to prove that French did, in fact, steal toilet paper or other cleaning supplies. Instead, the Court considers the statements for the effect they had on Mohr—that is, to explain why Mohr decided to fire French.

[8] Geraldine McLendon, described County toilet paper as "big toilet paper rolls" for a "public bathroom." Tr. 72:1. Another Board of Elections employee confirmed this description of the toilet paper in the Board of Elections restrooms. Tr. 103:3-8.

[9] At trial, French impeached Little's testimony that French was not at her desk when he walked past to view the toilet paper. The Court has considered this impeachment, but it still found Little to be a credible witness.

7

After receiving Little's report, Bochiechio walked by French's desk and saw "a very sheer white bag, like a grocery bag," Tr. 141:6-7, with two rolls of County-issued toilet paper. Tr. 124:16-20. Bochiechio looked at the bag "very closely," because Little had made "a serious allegation," and Bochiechio "wanted to make sure that [she] could see very clearly what" was in the bag. Tr. 144:6-8. Bochiechio then spoke with Deputy Commissioner Grant Loomis about what she had seen, and the pair decided to "wait and see what happens." Tr. 125:20-22.

Board of Elections employees began lining up to punch out at around 5:00 p.m. Bochiechio was at her desk, approximately five feet from the time clock, Tr. 143:1-4, when she saw French standing in line with the bag containing the "very distinct" toilet paper. Tr. 144:3. Loomis confirmed Bochiechio's account: he saw French, four to five feet away, Tr. 172:12-14, "carrying a plastic grocery type bag, a very thin plastic." Tr. 171:21-23. As with Little and Bochiechio, the bag's contents were "clearly visible" to Loomis: he saw "two large rolls of toilet paper that you would find in a commercial setting." Tr. 171:24 – 172:1. Loomis and Bochiechio then saw French punch out and leave the building with the bag containing toilet paper. They walked to Loomis' office to look out his third-floor window, where they saw French leaving the building with the bag.

Bochiechio returned to her desk and immediately wrote a memo to Mohr recording her observations. Tr. 127:2-5. Bochiechio's memo stated that she "saw the toilet paper"—"one large roll and one small roll"—"in [French's] bag." Def. Ex. 3. Further, Bochiechio reported, she witnessed French "carr[ying] her belongings and the white bag out the door" at 5:00 p.m. *Id.* Bochiechio concluded that "[i]t was clear as day that there were two rolls of County toilet paper [French's] white grocery bag." *Id.*

8

Loomis called Mohr to inform him of what Loomis had seen, and the following work day, Loomis prepared a memo to Mohr recording his observations. Tr. 174:23-24; Tr. 191:9-14. Like Bochiechio, Loomis reported that he had seen French "leave the office with a plastic bag that contained at least two rolls of what clearly looked like county issued toilet paper (large rolls with center paper rings several inches wide to accommodate commercial dispensers." Def. Ex. 2. And, like Bochiechio, Loomis described French's bag as "very thin," such that "the objects inside were clearly visible." *Id.* Neither Loomis nor Bochiechio were aware of French's EEOC complaint at the time they witnessed and reported French's actions.[10] Tr. 128:2-6 (Bochiechio); Def. Ex. 36 ¶ 6 (Loomis).

French's recollection of March 16 was different. She testified that she carried a white plastic bag that held a newspaper and a white Styrofoam container for her leftover lunch. Tr. 38:5-10. French flatly denied leaving work with County-owned toilet paper. Tr. 28:18-29:1. She did, however, confirm that Loomis and Bochiechio were "standing at a wall . . . by the door" as she left the office. Tr. 38:13-16. No one stopped French as she left.

**French's termination**

Mohr returned to the office the following week day, March 19. (French had allegedly stolen the toilet paper on a Friday.) Based on the information he had received from Bochiechio and Loomis, and after speaking with Loomis, Mohr decided to fire French. Tr. 214:15-18. French's alleged theft was a violation of two provisions of the

---

[10] French attempted to impeach Bochiechio's testimony that she was unaware of the EEOC complaint at the time of French's termination. Tr. 146:15 – 150:6. The Court, however, found the attempted impeachment to be ineffective. Based on its observation of her tone and demeanor during trial, the Court found Bochiechio to be a very credible witness. As a result, the Court finds that, as Bochiechio testified, she did not know about French's EEOC complaint at the time of French's termination. Rather, Bochiechio first learned about French's EEOC complaint at some point during the course of this litigation. Tr. 149:25 – 150:6.

Erie County Employee Handbook. *See* Def. Ex. 1. Specifically, the Employee Handbook prohibits "theft of property . . . belonging . . . to [Erie] County," and it separately prohibits "[u]nauthorized use and/or removal of County property . . . from County premises." *Id.* at 28. The County Handbook classifies both violations as "Group A" violations that, unlike less serious offenses, "may result in immediate discharge." *Id.* at 27. Mohr testified that several other Board of Elections employees who had stolen County property had been fired and, in some cases, referred to the District Attorney for prosecution. In addition, Mohr decided to fire French because he felt that employee theft of government property impaired the integrity of the Board of Elections, something that Mohr testified is important to both the public and candidates for public office. Mohr flatly—and, the Court finds, very credibly—denied that French's EEOC complaint played any role in his decision to fire French. Tr. 192:17-24; 199:19-20.

Mohr drafted a letter to French explaining the reasons for her termination. The letter stated that, "[o]n March 9, 2012 [Mohr] received written information from maintenance supervisor Paul Palumbo that paper products and other cleaning supplies were reportedly stolen from the cart of cleaner Ger[a]ldine McLendon while she was cleaning the 3rd floor restrooms at the board of elections office." Pl.'s Ex. 9. The letter further stated that, "earlier that day, it was reported to [Mohr] by an employee of the board of elections that they had previously observed supplies of the kind indicated in the theft report in [French's] possession. Upon inquiry, a supervisor of the board of elections confirmed that two other employees had remarked to him that they had also observed restroom paper products supplied by the county concealed in a drawer of your desk." *Id.* The letter then recounted that, on March 16, Loomis and Bochiechio had "observed"

French "leaving the premises carrying a transparent plastic bag containing restroom paper products belonging to the county." *Id.* The letter noted that "[p]revious incidents of theft occurring at the board of elections have been dealt with by termination of county service and, in the most serious cases, prosecution." *Id.* Finally, the letter concluded, French's employment would be terminated "effective immediately."

At trial, French called the allegations in Mohr's letter a "surprise." Tr. 50:25 – 51:1. She emphatically denied stealing "paper products" from work, concealing them in her desk or in a drawer, or leaving the Board of Elections with them. Tr. 28:18-29:1. French acknowledged that she did take "end rolls"—what she described as small, nearly-used rolls of toilet paper—from the cleaner's cart or from the windowsill in the restroom, where cleaning staff would leave them. Tr. 29:4-11. French testified, however, that she kept the end rolls at her desk to use as facial tissues when she ran out of Kleenex. Tr. 29:11-13. French also testified that she took other cleaning supplies from the cleaner's cart to clean her desk and windowsill at work, but she again vehemently denied taking any County-owned toilet paper or cleaning supplies outside the Board of Elections building. Tr. 31:1-13.

## CONCLUSIONS OF LAW

French's only remaining claim is for retaliatory discharge under Title VII of the Civil Rights Act of 1964. *See* Docket No. 42; Docket No. 61 ¶ 2.

The *McDonnell-Douglas* burden-shifting analysis applies to this claim. *See Terry v. Ashcroft*, 336 F.3d 128, 140-41 (2d Cir. 2003). French must therefore first make out a *prima facie* claim of retaliatory discharge. To do so, she must show the following: "(1) participation in a protected activity known to the defendant; (2) an employment action

11

disadvantaging the plaintiff; and (3) a causal connection between the protected activity and the adverse employment action." *Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 94 (2d Cir. 2001).

Two of these factors are easily satisfied. There is no dispute—and the Court therefore finds—that French's EEOC complaint is a "protected activity" and that her termination was an "adverse employment action." Likewise, Mohr testified (and the Court finds) that he knew of French's EEOC complaint at the time he fired French. The only question, then, is whether French has, for purposes of establishing a *prima facie* case, shown a causal connection between her EEOC complaint and her termination.

The Court need not decide this question, however, because even if French has made out a *prime facie* case, she is not entitled to relief. If French established a *prima facie* case of retaliatory discharge, the burden shifts to the County to articulate a "legitimate, non-retaliatory reason for the adverse employment action." *Ya-Chen Chen v. City Univ. of N.Y.*, 805 F.3d 59, 70 (2d Cir. 2015) (quotation marks omitted). The County has done so by arguing that it fired French because she stole two rolls of County-owned toilet paper. Theft from an employer is a legitimate, non-retaliatory reason for terminating an employee. *See, e.g.*, *Crews v. Trustees of Columbia Univ. in City of New York*, 452 F. Supp. 2d 504, 523 (S.D.N.Y. 2006). Indeed, the Erie County Employee Handbook lists theft of County property as an offense that "may result in immediate discharge," Def. Ex. 1 at 27, and French acknowledged at trial that theft is a basis for firing an employee. Tr. 61:24 – 62:1.

Because the County has articulated a legitimate, non-retaliatory reason for terminating French, "the presumption of retaliation arising from the establishment of the

*prima facie* case drops from the picture," and French must "come forward with [evidence that the] non-retaliatory reason is a mere pretext for retaliation." *Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 845 (2d Cir. 2013) (citation omitted). To do so, French must show that retaliation was a "but-for" cause of her firing, and not simply a "substantial" or "motivating" factor. *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013). "A plaintiff may prove that retaliation was a but-for cause of an adverse employment action by demonstrating weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate, nonretaliatory reasons for its action." *Kwan*, 737 F.3d at 846. A plaintiff's termination "can have multiple 'but-for' causes, each one of which may be sufficient to support liability. Requiring proof that a prohibited consideration was a 'but-for' cause of an adverse action does not equate to a burden to show that such consideration was the 'sole' cause." *Id.* at 846 n.5 (citations omitted).

The focus of a Title VII retaliation claim "is the employer's subjective motivation for the action." *Villa v. CavaMezze Grill, LLC*, 858 F.3d 896, 901 (4th Cir. 2017). In a case such as this one—in which an employer fires an employee who allegedly engaged in misconduct after engaging in protected activity—the question for the fact-finder is, therefore, "whether the employer took the adverse action because of a good faith belief that the employee [engaged in misconduct] (in which case there is no liability), or because the employee [engaged in protected activity] (in which case the employer's conduct would violate Title VII . . . .)." *Richey v. City of Independence*, 540 F.3d 779, 785 (8th Cir. 2008) (citations omitted). In other words, to show that retaliation was a but-for cause of her termination, French must demonstrate that Mohr did not have a good faith belief that French stole County-owned property. "Whether the termination decision was wise, fair,

13

or even correct is immaterial," *Villa*, 858 F.3d at 903 (quotation marks omitted)—what matters is "the facts the decision-maker actually perceived." *Id.* at 901. Thus, if an employee "was fired for misconduct she did not actually engage in, that is unfortunate, but a good-faith factual mistake is not the stuff of which Title VII violations are made." *Id.* at 903. Put differently, "[w]hen an employer is told of improper conduct at its workplace, the employer can lawfully ask: is the accusation true?" *EEOC v. Total Sys. Svcs., Inc.*, 221 F.3d 1171, 1176 (11th Cir. 2000). And if, having investigated that question, the employer disciplines or fires an employee based on a "good faith belief that [the] employee engaged in misconduct, then the employer has acted because of perceived misconduct, not because of protected status or activity." *Richey*, 540 F.3d 784.

After careful consideration of the evidence introduced at trial, the Court concludes that French has not shown by a preponderance of the evidence that Mohr did not have a good faith belief that French stole County-owned toilet paper. Mohr received two nearly contemporaneous and relatively detailed memos from his Deputy Commissioner and his Office Manager, both reporting that they personally witnessed French walk out of the building carrying County-owned toilet paper. Further, one of these reports (Bochiechio's) stated that a third person (Little) had also seen toilet paper in French's bag. These reports were not only consistent with each other, but they were also consistent with an independent report Mohr had received from Palumbo one week earlier.

French has offered no evidence suggesting that Mohr should not have relied on these reports in concluding that she stole County-owned toilet paper. Likewise, French has presented no reason to question whether, having concluded that she stole County-

owned property, Mohr was entitled to fire French; indeed, French acknowledged at trial that theft of County property is a terminable offense.

The bulk of French's response claims that Little, Bochiechio, and Loomis did not, for various reasons, accurately report the contents of the bag French carried on March 16. But the critical question in this case is not whether these witnesses were biased, mistaken, or lying when they reported French's alleged theft; the question, instead, is whether Mohr had any reason to question or doubt the reports he received. If Mohr had no reason to question the reports or the reporters, he cannot be faulted for relying on them to conclude that French stole County-owned property.

Put differently, *even if* the Court assumes that Little, Bochiechio, and Loomis inaccurately reported their observations or made false reports (a conclusion the Court does not endorse), French offered no evidence suggesting that Mohr was, or should have been, aware of the possibility of bias or false reporting. Because the focus of French's Title VII retaliation claim is "the facts [Mohr] actually perceived," *Villa*, 858 F.3d at 901, what matters in this case is whether Mohr had any reason to think that the reports he had received were pretextual or retaliatory. He did not, and as a result, he was entitled to rely on the reports to conclude that French stole County-owned property. Mohr may or may not have been correct when he concluded that French stole County-owned property, but Title VII is not concerned with the accuracy of Mohr's factual conclusion—"[p]retext is not demonstrated by showing simply that the employer was mistaken." *Sempier v. Johnson & Higgins*, 45 F.3d 724, 731 (3d Cir. 1995). *See also McPherson v. N.Y.C. Dep't of Ed.*, 457 F.3d 211, 216 (2d Cir. 2006) (noting that, "[i]n a discrimination case," the law is "decidedly not interested in the truth of the allegations against plaintiff" but is instead

"interested in what 'motivated the employer'") (quoting *USPS Bd. of Govs. v. Aikens*, 460 U.S. 711, 716 (1983)) (emphasis omitted). Title VII is instead concerned with whether Mohr had a good faith belief that French engaged in misconduct. The Court finds that he did.

For the same reason, French may not demonstrate pretext by arguing that Mohr's factual conclusion is open to doubt or by suggesting that Mohr should have more thoroughly investigated claims of French's alleged theft. To make a non-retaliatory decision to fire an employee for misconduct, an employer "can lawfully act on a level of certainty that might not be enough in a court of law. In the workaday world, not every personnel decision involving," as in this case, employee theft, "has to be treated as something like a trial" for larceny. *Total Sys. Svcs.*, 221 F.3d at 1176 (making this point with regard to an employee's false statements). Title VII, in other words, does not authorize federal courts to act "as a kind of super-personnel department" by "second-guess[ing]" an employer's honest (but, perhaps, mistaken) belief that an employee engaged in misconduct. *Id.*

French's ability to show pretext is further undermined by Mohr's testimony that French's EEOC complaint played no role in his decision to fire French. Based on its observation of Mohr's tone and demeanor during trial, the Court found Mohr's testimony to be very credible. Mohr also credibly testified that prior instances of employee theft at the Board of Elections have—like French's case—resulted in termination and, in some cases, prosecution referrals. Tr. 227:4-13. Finally, French does not contest that the Erie County Employee Handbook identifies employee theft as an offense that can result in

16

immediate termination. French cannot, then, show that she was treated harshly compared to other employees who have stolen County property.

Because she cannot make this showing, French attacks the credibility of each of the County's witnesses. As noted above, however, the only witness whose testimony is critical to the Court's decision is Mohr's.

French primarily attacks Mohr's investigation as contrived and inadequate. Specifically, French argues that when Mohr received French's EEOC complaint, he did not "question the named parties"—that is, French's supervisors—but instead "rel[ied] on [his] personal knowledge of the parties and d[id] nothing." Docket No. 66 ¶ 145. French argues that this is inconsistent with "standard practice in a management situation where a charge of discrimination is involved." *Id.* French concludes that, because Mohr did not independently investigate her complaints, he had "another plan": "termination." *Id.* ¶ 148. Moreover, French argues, Mohr's decision to fire French without investigating the claims of theft was inconsistent with Mohr's practice of attempting to resolve personnel issues himself. *Id.* ¶ 151. *See also* Tr. 151:7 (Bochiechio's testimony that Mohr is a "hands-on Commissioner").

French's attacks on Mohr's credibility are unavailing. As the County notes, Mohr's decision to not interview his employees after receiving the EEOC complaint is unremarkable because "it is the EEOC—not the employer—that is responsible for conducting an investigation and gathering information from those involved." Docket No. 68 at 18. Moreover, the EEOC expressly instructed Mohr that "[n]o action is required by [the County]" when Mohr first received notice of French's EEOC complaint. Tr. 197:1-2. It was not until several weeks *after* French's termination that the EEOC asked Mohr to

17

respond to French's complaint. Def. Ex. 11. The Court therefore finds nothing unusual about the manner in which Mohr handled French's EEOC complaint, and certainly nothing that undermines Mohr's credibility. Finally, the Court finds no support in the record for French's speculative claim that Mohr, in effect, conspired with his employees to find a pretextual reason to fire French in retaliation for her EEOC complaint.

For these reasons, the Court concludes that French has failed to meet her burden of showing that retaliation for filing an EEOC complaint was a but-for cause of her termination.

## CONCLUSION

For the reasons stated above, the Court finds that the Defendant, County of Erie, is entitled to judgment on Plaintiff Jacqueline French's Title VII retaliation claim. In light of these findings and conclusions, as well as the Court's January 31, 2018 Decision and Order (Docket No. 42) granting summary judgment for the Defendant on the Plaintiff's other claims, the Clerk of Court shall enter judgment for the Defendant on all claims and take all steps necessary to close this case.

**SO ORDERED.**

Dated: December 12, 2018  　　　　　　　　　　　　　 _s/Richard J. Arcara_
　　　Buffalo, New York  　　　　　　　　　　　　　 HONORABLE RICHARD J. ARCARA
　　　　　　　　　　　　　　　　　　　　　　　　　 UNITED STATES DISTRICT JUDGE

18